SEALED

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| DANTE SHEROD HAMPTON | ) | 6:19-mj-*1547* |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ May 28, 2019 _____ in the county of _____ Brevard _____ in the
_____ Middle _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Distribution of a controlled substance, specifically heroin. |

This criminal complaint is based on these facts:

See the attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Mathew S. Pagliarini, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  07/31/2019

_____
*Judge's signature*

City and state:  _____ Orlando, Florida _____

Embry J. Kidd, U.S. Magistrate Judge
*Printed name and title*

**STATE OF FLORIDA**

**COUNTY OF ORANGE**

Case No.: 6:19-mj-1547 - COMPLAINT
6:19-mj-1548
Filed "Under Seal"

## MASTER AFFIDAVIT

1.    I, Mathew S. Pagliarini, am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since July 2009. As a FBI SA, I am an "investigator or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States, who is empowered by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516(1).

2.    As a graduate of the FBI Training Academy, I have received training in Title 18 and Title 21 violations to include drug trafficking . I have been personally involved in investigations concerning the possession, manufacture, distribution, and importation of controlled substances, as well as the methods used to finance drug trafficking and launder drug proceeds.

3.    I have been trained in the methods that drug traffickers use to distribute controlled substances, and I am familiar with the means by which drug traffickers manage, transport, and conceal the proceeds of their drug trafficking activities.

4.    During my tenure with the FBI, I have participated in narcotics

investigations, and I am familiar with various methods of investigation, including, but not limited to: controlled purchases of narcotics, visual surveillance; interviewing of witnesses; executing arrest warrants; the use of confidential informants and sources; the use of pen registers and trap and trace devices; the installation and use of GPS mobile tracking devices; the use of electronic recording/listening devices; and the utilization of court-authorized prospective cell-phone geo-location information in the investigation of narcotics offenses and have participated in Title III wiretap investigations.

5. Before becoming a FBI Special Agent, I was a sworn law-enforcement officer with the Mount Pleasant Police Department in Mount Pleasant, South Carolina, for approximately 10 years. During my tenure I functioned as a uniformed Patrol Officer, Traffic Fatality Investigator and Training Officer.

6. Prior to my employment with the Mount Pleasant Police Department, I was a sworn Detention Officer with the Charleston County Sheriff's Office in Charleston County, South Carolina for approximately 1 year. During my tenure, I functioned as a Detention Officer and Central Control Officer overseeing approximately 1300 inmates.

7. Over the last approximately 20 years as a sworn law enforcement officer, I have received training and experience concerning investigations of

federal and state narcotics. In connection with my duties and responsibilities as a state and federal law enforcement officer, I have testified in federal and state judicial proceedings and prosecutions for violations of laws concerning controlled substances, bank robberies, child pornography and crimes on the high seas.

## PURPOSE OF AFFIDAVIT

8.     This affidavit is based upon knowledge that I have acquired during an investigation of drug trafficking criminal activities committed by persons in the Middle District of Florida. This affidavit is based upon my personal knowledge, training, and experience as a law enforcement officer, information that I received from other law enforcement officers and agents, and information received from other investigative means, including surveillance, interviews, and controlled purchases of narcotics. The statements contained in this affidavit are based, in part, on information from other FBI SAs or Task Force Officers (TFO), DEA SAs, Titusville Police Department (TPD) Investigators, and Florida Department of Law Enforcement (FDLE) Investigators. Further, because this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint and search warrant, I have not included every fact or facet of the investigation known to me, only those facts necessary

to establish probable cause for the issuance of a criminal complaint for

DANTE SHEROD HAMPTON ("HAMPTON") for violating 21 U.S.C. §

841(a)(1), distribution of a controlled substance, specifically heroin, on or

about May 28, 2019, June 14, 2019, and June 25, 2019, as well as those facts

necessary to establish probable cause to search the residence and property at

1018 Rabun Lane, Titusville, Florida, 32780 (further described in Attachment

A), and to seize evidence related to the commission of the aforementioned

violations of 21 U.S.C. § 841(a)(1), distribution of a controlled substance,

specifically heroin (further described in Attachment B).

## FACTS ESTABLISHING PROBABLE CAUSE

9.     In January 2019, the FBI initiated an investigation focused on a

criminal drug trafficking organization involved in the acquisition and

distribution of large quantities of heroin in the Middle District of Florida,

specifically in Brevard County, Florida.  During the investigation, agents

identified HAMPTON as a distributor of heroin in the organization operating

in Titusville, Florida.

10.     According to the National Crime and Information Center, and

the State of Florida Department of Corrections, HAMPTON has multiple

state felony arrests and convictions, related to the possession, sale, and

trafficking of controlled substances.  On or about June 3, 2014,  HAMPTON

4

was sentenced to six years and one month in state prison for cocaine sale, manufacturing and delivery.

11.     During this investigation, FBI used a confidential source (hereinafter referred to as "CS") to make controlled purchases of heroin from HAMPTON. The CS has an extensive felony and misdemeanor criminal history to include but not limited to possession/sale/delivery/manufacturing of controlled substances, theft, possession of a firearm and battery related offenses. The CS provided information and services to FBI during this investigation in hopes of receiving favorable consideration in the disposition of his/her criminal case for violations involving the possession of controlled substances, specifically heroin. During the course of this investigation, the information provided by the CS has been corroborated by law enforcement officers and found to be accurate and credible.

12.     Prior to the CS cooperating with law enforcement, the CS was arrested for violation of probation during a probation search in or about December of 2018. The search resulted in heroin being seized from the CS' residence. The CS subsequently agreed to cooperate with law enforcement and identified his/her source of supply for heroin as HAMPTON. The heroin seized at the CS residence was fronted to the CS by HAMPTON and the CS owed HAMPTON $2,600 for the heroin.

13.     On May 28, 2019, at the direction of law enforcement officers,

the CS arranged for the purchase of a half-ounce of heroin from HAMPTON

in Titusville, Florida. The CS and law enforcement agreed that the CS would

purchase heroin for a total of $1,400, but that $100 of that total would go

toward the debt the CS owed Hampton from heroin previously seized by law

enforcement.

14.     At the direction of law enforcement, at approximately 10:41 a.m.

the CS made a recorded telephone call to HAMPTON and advised that

he/she needed a "half a yard" referring to a half of an ounce of heroin.

HAMPTON advised that he would need to call his people to obtain the

heroin. At approximately 10:55 a.m. HAMPTON called the CS to advise that

it would be at least an hour before he could get the heroin as he needed to wait

until his people got a break from work.

15.     At approximately 11:20 a.m. law enforcement conducted

surveillance and watched HAMPTON leave his residence, located at 1018

Rabun Lane, Titusville, Florida, in a black Pontiac Grand Prix bearing

Florida tag ECW-X73. Law enforcement followed HAMPTON to a Circle K

convenience store in Rockledge, Florida where he backed into a parking spot

on the northeast side of the store. At approximately 11:56 a.m. a red Nissan

Altima pulled up next to HAMPTON, a black female exited her vehicle, handed something to HAMPTON and entered the store. HAMPTON then left the parking lot and drove back to his residence.

16.    At approximately 12:35 p.m. HAMPTON called the CS to advise that the heroin was ready to be picked up at his residence. The CS was provided with $1,400 by the DEA to make the controlled purchase of heroin from HAMPTON, with the understanding that $100 of that money was to be put toward the debt the CS owed HAMPTON as previously described. At approximately 12:45 p.m., at the direction of law enforcement, the CS traveled to HAMPTON's residence. As the CS pulled into the driveway, HAMPTON exited the front door of the residence, approached the passenger's side front window of the CS vehicle, and provided the CS with a clear plastic bag containing heroin. Then, the CS gave HAMPTON the $1400.

17.    The CS' vehicle was equipped with audio and video recording equipment that captured the meeting during the acquisition of the heroin from HAMPTON. The CS and law enforcement officers identified HAMPTON as the individual with whom he/she met and from whom he/she obtained the heroin. The bag of heroin weighed approximately 16.1 gross grams and field-tested positive for heroin. The purchased heroin was later transferred to the DEA Southeast Regional Laboratory for further analysis and safekeeping. A

DEA laboratory analysis is pending.

18.    On June 14, 2019, at the direction of law enforcement officers, the CS again arranged for the purchase of a half-ounce of heroin from HAMPTON in Titusville, Florida. Once again, the CS purchased the heroin for $1400.00 with $100.00 of that to go toward the CS' previous debt to HAMPTON.

19.    At the direction of law enforcement, at approximately 11:07 a.m. the CS made a recorded telephone call to HAMPTON and advised that he/she needed a "half a game" referring to a half of an ounce of heroin. HAMPTON advised that he was "at the crib" referring to his residence in Titusville, Florida. Once again, the CS was provided with $1,400 by the FBI to make the controlled purchase of heroin from HAMPTON with the understanding that $100.00 of that money was to be put toward the debt the CS owed HAMPTON. At approximately 11:24 a.m. the CS traveled to HAMPTON's residence. As the CS pulled into the driveway HAMPTON exited the front door of the residence, approached the driver's side front window of the CS vehicle, and provided the CS with a clear plastic bag containing heroin. At that point, the CS gave HAMPTON the $1400.

20.    Again, the CS' vehicle was equipped with audio and video recording equipment that captured the purchase of heroin from HAMPTON.

8

The CS and law enforcement officers identified HAMPTON as the individual with whom he/she met and from whom he/she obtained the heroin. The bag of heroin weighed approximately 14.9 gross grams and field-tested positive for heroin. The purchased heroin was later transferred to the DEA Southeast Regional Laboratory for further analysis and safekeeping. A DEA laboratory analysis is pending.

21. Once again, on June 25, 2019, at the direction of law enforcement officers, the CS arranged for the purchase of an ounce of heroin from HAMPTON in Titusville, Florida. This time, the CS and law enforcement agreed to purchase the heroin for $2,800 with $200 of that to go toward the debt the CS owed Hampton.

22. At the direction of law enforcement, at approximately 11:29a.m., 11:30a.m., and 11:31a.m., the CS made recorded telephone calls to HAMPTON but the calls went to voicemail. At approximately 11:33 a.m., the CS received an incoming call from HAMPTON which was recorded by law enforcement. Upon answering, the CS advised that he/she needed a "whole one" referring to an ounce of heroin. Hampton advised that he would need to call his people to make sure they were home and would call back.

23. At approximately 12:06 p.m., the CS made a recorded telephone

call to HAMPTON. During that call HAMPTON advised the CS that "she don't get off work until 2:00 p.m." so he would not be able to do the deal until after that time. HAMPTON further advised the CS that he had a "vic" right now to hold him over (a "vic" refers to seven grams of heroin). The CS told HAMPTON that he/she needed the "whole thing" and not seven grams. HAMPTON advised the CS that he would call the CS back before he went to pick up the heroin.

24.    At approximately 5:07 p.m., HAMPTON called the CS to advise that he would have the heroin in about fifteen minutes. This call was not monitored but was answered by the CS at the direction of law enforcement. At approximately 6:21 p.m., at the direction of law enforcement, the CS made a recorded telephone call to HAMPTON advising he would meet HAMPTON at his residence in about fifteen minutes.

25.    The CS was provided with $2,800 by the DEA to make the controlled purchase of heroin from HAMPTON with the understanding that $200.00 of that money was to be put toward the CS' debt. At approximately 6:36 p.m. the CS traveled to HAMPTON's residence. As the CS pulled into the driveway, HAMPTON exited the front door of the residence, approached the driver's side front window of the CS' vehicle, and provided the CS with a clear plastic bag containing heroin. Then, the CS gave HAMPTON the

$2800.

26.     The CS' vehicle was equipped with audio and video recording equipment that captured the purchase of the heroin from HAMPTON. The CS and law enforcement officers identified HAMPTON as the individual with whom he/she met and from whom he/she obtained the heroin. The bag of heroin weighed approximately 29.1 gross grams and field-tested positive for heroin. The purchased heroin was later transferred to the DEA Southeast Regional Laboratory for further analysis and safekeeping. A DEA laboratory analysis is pending.

## METHODS USED BY DRUG TRAFFICKERS

27.     As a result of my law enforcement experience and this investigation, I am familiar with the ways in which the members of narcotics organizations conduct their business, including, but not limited to, their methods of importing and distributing narcotics, their use of numerical codes and code words to conduct their transactions in secret, and their methods of laundering the proceeds of their narcotics trafficking. Through my experience and my discussions with other experienced law enforcement officers, I am familiar with the methods, schemes, and operations used by drug traffickers and know:

a.      That such illegal drug traffickers commonly place assets in names other than their own to avoid detection of these assets by government agencies;

b.      That even though those assets are in other person's names, the illegal drug traffickers continue to use those assets and exercise dominion and control over them;

c.      That illegal drug traffickers maintain, on hand, large amounts of United States currency in order to maintain and finance their ongoing illegal drug trafficking business;

d.      That illegal drug traffickers maintain books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, sale, and distribution of illegal drugs and those documents may be in code. That traffickers commonly "front" illegal drugs (meaning they will provide illegal drugs to their customers on consignment and the customers will pay for it at a later date). That the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the illegal drug traffickers have ready access to them, *i.e.,* homes;

e.      That it is common for illegal drug traffickers to secret contraband, proceeds of illegal drug sales, and records of illegal drug transactions, sources, and customers, in secure locations within their

residences, offices, garages, storage buildings, and other locations, including

stash houses, for ready access, and also to conceal such items from law

enforcement authorities;

      f.     That persons involved in such trafficking conceal caches of

illegal drugs, large amounts of currency, financial instruments, precious

metals, jewelry, and other items of value and/or proceeds of drug

transactions, and evidence of financial transactions relating to obtaining,

transferring, secreting, or spending large sums of money made from engaging

in illegal drug trafficking activities, in their residences, offices, garages, storage

buildings;

      g.     That illegal drug traffickers commonly maintain addresses

or telephone numbers in books, papers, or cellular phones (and often have

multiple cellular phones) which reflect names, addresses, and/or telephone

numbers for their associates in the trafficking organization, even if said items

may be in code;

      h.     That illegal drug traffickers frequently take, or cause to be

taken, photographs of themselves, their associates, their property, and their

product, and that these traffickers usually maintain these photographs in their

residences;

i.     That when traffickers amass large monetary proceeds from the sale of illegal drugs, they attempt to legitimize these profits by utilizing banks and their attendant services, including securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, business fronts, and other methods;

j.     That it is common for illegal drug traffickers to travel to Mexico and other source countries in order to purchase bulk shipments of illegal drugs.  I know that after purchasing illegal drugs, the traffickers will transport or cause the illegal drugs to be transported to the areas in which they will sell and distribute it.  I know that the methods of transportation include, but are not limited to, rental automobiles, private automobiles, common carriers such as Federal Express, private trucking companies, or privately owned tractor-trailers;

k.     That illegal drug traffickers sometimes store documents and records relating to their drug supplies, customers, money, and assets on computer hardware and software, the contents of which frequently yield evidence of trafficking and money laundering crimes;

l.     That courts have recognized that unexplained wealth is probative evidence of criminal activity in which transactions involving large

amounts of cash and high profit margins are common, including trafficking in controlled substances;

m.     That it is common for illegal drug traffickers to use, carry, and possess firearms and ammunition in the course of their narcotics trafficking to use as protection for themselves and their proceeds and narcotics, and that it is common for illegal drug traffickers to store and conceal such firearms and ammunition in locations that they control or own, including their own residence or place of work; and

n.     That it is common for narcotics traffickers and money launderers to conceal and store items related to their narcotics trafficking and money laundering within safes, footlockers, boxes, containers and other hidden compartments, and within places that they own or over which they exercise control.

## ELECTRONIC DEVICES AND FORENSIC ANALYSIS

28.     HAMPTON has used at least one cellular telephone number during the course of this investigation. The CS contacted HAMPTON at (321) 289-2084 on May 28, 2019, June 14, 2019, and June 25, 2019 regarding the controlled purchase of heroin on those dates. Based on my training, experience, and this investigation, I believe that this cellular telephone is located at 1018 Rabun Lane, Titusville, Florida, with HAMPTON. For

various reasons, drug traffickers may discontinue the use of their cellular telephones but usually do not discard them. Based on my experience, drug traffickers keep their old cellular telephones at their residence. I have participated in numerous search warrants and recovered new, current, and old cellular telephones used by the targets of investigation to facilitate their drug trafficking business or other criminal activity. Based upon my knowledge, training and experience, I know that electronic devices, such as telephones, can store information for long periods of time. I further know that telephones often contain evidence of the crime including but not limited to text messages, pictures, locations, and the identification of co-conspirators. Further, I know that information that has been deleted by the user can sometimes be recovered with forensic tools.

29. *Forensic evidence.* As further described in Attachment B, this application seeks permission to search cellular telephones for electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the particular device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the listed telephones because:

a. Data on the telephone can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file.

b. Forensic evidence on the telephone can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the listed telephones were used, the purpose of their use, who used them, and when.

30. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of cellular telephones listed in Attachment B consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the telephones, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

31. Based upon the information and facts set forth in this affidavit, I submit there is probable cause to believe that:

a. HAMPTON committed violations of 21 U.S.C. § 841(a)(1), distribution of a controlled substance, specifically heroin, on May 28, 2019, June 14, 2019, and June 25, 2019.

b. Evidence of violations of 21 U.S.C. § 841(a)(1) will be found at HAMPTON's residence, identified as 1018 Rabun Lane, Titusville, Florida, 32980.

Respectfully,

Mathew S. Pagliarini Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me
this __3l3th__ day of July, 2019.

The Honorable Embry J. Kidd
United States Magistrate Judge

18